I5h9piz1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                        17-cr-151 (AJN)

5  ROBERT PIZARRO and
   JUAN RIVERA,
6
             Defendants.              Conference
7  ------------------------------x

8                                     New York, N.Y.
9                                     May 17, 2018
                                      9:46 a.m.
10
   Before:
11
                      HON. ALISON J. NATHAN
12
                                      District Judge
13
                          APPEARANCES
14
   GEOFFREY S. BERMAN
15      United States Attorney for the
        Southern District of New York
16 BY:  JASON M. SWERGOLD, ESQ.
        JESSICA FENDER, ESQ.
17      JARED P. LENOW, ESQ.
        LISA ZORNBERG, ESQ.
18      Assistant United States Attorneys

19 ELIZABETH E. MACEDONIO, P.C.
        Attorneys for Defendant Pizarro
20 BY:  ELIZABETH E. MACEDONIO, ESQ.
        -and-
21 FREEMAN NOOTER & GINSBERG
        Attorneys for Defendant Pizarro
22 BY:  LOUIS M. FREEMAN, ESQ.
        -and-
23 CARLA SANDERSON LAW
        Attorneys for Defendant Pizarro
24 BY:  CARLA M. SANDERSON, ESQ.

25

I5h9piz1

1    APPEARANCES (Cont'd)

2    LAW OFFICES OF BOBBI C. STERNHEIM, ESQ.
          Attorneys for Defendant Rivera
3    BY:  BOBBI C. STERNHEIM, ESQ.
          -and-
4    ROTHMAN, SCHNEIDER SOLOWAY & STERN, LLP
          Attorneys for Defendant Rivera
5    BY:  JEREMY SCHNEIDER, ESQ.

6

7    Also Present:  Hannah Harney
                    Paralegal

8                   Mayerlin Ulerio,
                    Paralegal
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5h9piz1

1            (Case called)

2            THE COURT:  I will take appearances, counsel, starting

3    with the government.

4            MR. SWERGOLD:  Good morning, your Honor.

5            Assistant United States Attorneys Jason Swergold,

6    Jessica Fender, Jared Lenow, and the Chief of the Criminal

7    Division for the United States Attorneys Office, Lisa Zornberg,

8    at counsel's table, along with our paralegal, Hannah Harney.

9    And I would also note the presence in the courtroom as well,

10   Robert Khuzami, Deputy United States Attorney, John McEnany,

11   Associate United States Attorney, Audrey Strauss, Senior

12   Counsel to the United States Attorney, and Michael Gerber,

13   Co-Chief of the Violent and Organized Crime Unit.

14           THE COURT:  Good morning to you all.

15           For the defendants.

16           MS. MACEDONIA:  Good morning, your Honor.  Elizabeth

17   Macedonia, Carla Sanderson and Louis Freeman for Mr. Pizarro.

18           THE COURT:  Good afternoon -- good morning.  And good

19   morning, Mr. Pizarro.

20           MR. FREEMAN:  It may feel like afternoon but it's

21   still morning.

22           THE COURT:  Still feels like last night.

23           MS. MACEDONIA:  Judge, if I could, just for the record

24   I have a visiting student from Canada, Chris Cheverie, is

25   present in the courtroom.

I5h9piz1

1          THE COURT:  Ms. Sternheim.

2          MS. STERNHEIM:  Good morning, Judge.

3          Bobbi C. Sternheim, Jeremy Schneider for Juan Rivera,

4   who is present at counsel table, and Mayerlin Ulerio, our

5   paralegal, is present in the gallery.

6          THE COURT:  Good morning.

7          Good morning, Mr. Rivera.

8          DEFENDANT RIVERA:  Good morning.

9          THE COURT:  Well, we are here -- we were scheduled to

10  pick our jury this morning, which I called off the venire after

11  receiving defense motion to dismiss the indictment, and I think

12  a rather extraordinary letter from the government last night.

13         Just to recount where we are.  On May 4, which was the

14  Friday before trial, the government disclosed what I deemed

15  significant new information pertaining to an alternate

16  perpetrator as well as a series of individuals related to that

17  person and in a connection between that person and the

18  defendant who was on trial when the victim in this case, Robert

19  Bishun, was to testify in that trial was murdered.  All of that

20  significant new information had not previously been disclosed

21  by the government and it was disclosed the Friday before trial.

22         We met then on Monday, May 7, when we were prepared to

23  go to trial or planning to go to trial and discussed this

24  disclosure.  That time the government vigorously opposed

25  adjournment of the trial.  And I disagreed with that based on

I5h9piz1

1   what I saw in the new disclosures and the record defense

2   counsel made to me as to the lines of investigation that were

3   newly opened in light of the new material which also, I should

4   say, contradicted affirmative statements that the government

5   had made previously about the absence of any additional

6   material that pertained to that alternate perpetrator.

7          There was consideration as to the length of

8   adjournment.  We came to discuss adjourning for two weeks,

9   adjourning possibly until June or until August, but ultimately

10  the joint request was for a two-week adjournment and, with a

11  great deal of effort, I was able to accommodate.  And so we

12  were scheduled to pick our jury today and proceed to trial on

13  Monday after that and, quite surprisingly, the government has

14  continued to produce new information.  And I don't mean

15  surprisingly because they ought not to have done that,

16  surprisingly because we continue to learn of new information.

17         I've received, and the defense received, two written

18  submissions from the government turning over additional

19  information that I think there can be no question they were

20  obligated to turn over.  It was new information and at least --

21  at least with respect to one of them an entirely new, I

22  think -- there was no contention even made by the government

23  that this was something that the defense had any basis for

24  knowing previously.

25         In response to that, the defendants have moved to

I5h9piz1

dismiss the indictment and the government, needless to say,

opposes that motion.  And in a letter originally filed under

seal, for which I saw no basis for filing it under seal and now

publicly docketed, the government said this:  There is no

question that the government made several mistakes both with

respect to the disclosures surrounding Guillen's statements to

the CI and regarding statements by the District Attorney of

New York cooperating witness.  These mistakes have received

attention at the highest levels of the office which has already

initiated training and other remedial measures throughout the

office to avoid these and similar mistakes in criminal cases.

The government apologizes to the Court and to the defense for

those mistakes for which we make no excuses.

I've never seen anything quite like that.  I've

unsurprisingly discussed it with a fair number of colleagues,

many of whom have been here far longer than I, and all of whom

agree that it was a rather extraordinary statement.  I did

request Ms. Zornberg to be here, and I'm pleased to see that

additional supervisors and leadership are in the office here in

light of that extraordinary statement.

It's concerning to see this admission of the failure

of the office, again, not concerning because it was made.  It

should be made if that's where we are, and I do appreciate the

necessary candor and appreciate that steps are being taken to

ensure to the extent that something has failed here or failed

I5h9piz1

systemically that measures are being taken, and I think it's

necessary not only in light of what's happened here.

I note just anecdotally that within the last few weeks

adjournments for similar reasons were necessary in a case in

front of Judge Seibel and in a case in front of Judge Woods.

That's deeply concerning.

I've have countless cases in which defense counsel

have made motions or requests for Brady and Giglio material and

the assistants stood up, as they did here, or wrote in a

submission to the Court that they're fully aware of their Brady

obligations.  The credibility of these assistants in particular

and the office in general on that score has taken a serious

hit, not only with me but with many of my colleagues who are

aware of this case and the others that I have mentioned.

We are here on the defense motion to dismiss the

indictment.  And I raise this level of concern because I do see

no authority cited in the defense brief, nor can I find any

that would allow me to dismiss the indictment under these

circumstances, but we do need to assure ourselves, I need to

assure myself that what has occurred here is the result of

error and not bad faith or a willful or intentional withholding

of materials.  It seems to me that is the immediate question as

to what has occurred here, and the necessity to know what has

occurred here and why I required the head of the criminal

division to be here so that I have assurance as much as

I5h9piz1

possible as to the accuracy of any representations that I am

getting as to what occurred here and that -- and what we know

or don't know as to what is -- has not yet been turned over or

disclosed.

So, Ms. Zornberg, do you want to take this?

I think I'll begin by asking what steps you've taken

to assure yourself that the disclosure failures here are the

result of error and maybe a lack of supervision and not bad

faith or willful disregard of obligations.

MS. ZORNBERG:  Thank you, your Honor.

Obviously this is not -- this is not an event in which

we celebrate.  This is not the finest hour of the office.

We do have an abiding commitment to this Court, to the

entire Court, to the Bar, to do the right thing.  And in this

case, and your Honor referenced anecdotally two other cases of

recent vintage where we've had disclosure issues pop up for a

variety of reasons.  I want to assure the Court that to the

highest levels of the office, myself, the U.S. Attorney, all

those present in the back of the courtroom today, we take this

with utmost seriousness.  We regard it as a training issue.

I have personally done a -- what I'll call a

postmortem in each case, including this one, which has involved

the briefings with unit chiefs and with other personnel of the

office to understand the particularities of what occurred, to

identify what action items we can take as an office to

I5h9piz1

1    implement better training.

2            I do view it in this area as an area that requires

3    constant training and vigilance.  I do regard the increase in

4    electronic data, the changes in how prosecutors and

5    investigators communicate about cases, the very and

6    ever-expanding means of electronic ways of communication as

7    presenting challenges at times, to really make sure that we are

8    scrubbing our files appropriately, that we're living up to all

9    of the disclosure obligations that are imposed on us and that

10   which we embrace.

11           And so in the wake of what occurred here and the

12   errors that were made in this case and the two others that the

13   Court referenced, we held an all-hands-on-deck internal

14   training of our unit chiefs this Monday of this week.  There

15   was no delay in our reaction that the errors themselves cannot

16   repeat and that we have an obligation to undertake every

17   responsible action we can do as managers in the office to make

18   sure that errors don't happen.  And when errors do happen, our

19   principle is that we need to openly and promptly understand the

20   errors, correct them, make them right, and live up to our duty

21   of candor to defendants and to the Court.

22           And that's what I think has happened here.  And so in

23   terms of responding to the Court, what we've done, I can report

24   to the Court that Monday we had and I led an internal training

25   for unit chiefs.  I worked with leadership of the office to

I5h9piz1

identify specific learning points and issues for further

training.  I directed that this week every AUSA in the criminal

division be -- receive additional training on those points

which are -- which make specific reference of efforts to ensure

no repeat of the errors that have come before your Honor.

So that training is ongoing and happening and will be

done this week.  That is the degree of swiftness and

seriousness with which we're learning from these issues and

reacting to them and I think living up to our obligation to

make sure that they are addressed fully.

In terms of whether there was any bad faith, I can

report to your Honor that I have -- I have found no indication

that any AUSA in this case or in the other two cases to which

you referred intentionally acted willfully to withhold

information.

I view this as an issue of the need for increased

training and vigilance, but I do think that the errors were

inadvertent.  There have been a lot of sleepless nights and a

lot of agonizing.  There is no AUSA involved -- this is my

belief -- who has purposely tried in matters of great

importance to the defendants, to the government, to the Court,

to withhold information.  These are errors.  That doesn't make

them excusable, but I do not believe that anyone has purposely

tried to sandbag the defense in this case or the other two.

THE COURT:  Then let me ask, just to press on that,

I5h9piz1

1   that and what's occurred here.  There was a disclosure on

2   May 4 -- and I think something had -- I don't know but

3   something had triggered some final review or some additional

4   concern, and I believe Mr. Swergold represented at the time

5   that it had already gone up to the highest levels in the

6   office, something had triggered the disclosure that happened on

7   the Friday before trial.  And yet -- and the government opposed

8   the adjournment and subsequently there have been additional

9   disclosures.  And so I think what I want to know is what --

10  what was known at the time -- and I don't know if this is for

11  you or Mr. Swergold -- but when the government did what it did

12  that produced the disclosure on May 4 and yet came in on May 7

13  opposing the adjournment, was there anything known at that

14  point about either additional material being out there that

15  needed to be turned over or that the searches -- that

16  additional searching needing to be done.

17          MS. ZORNBERG:  First of all, I know that Mr. Swergold

18  is prepared to address that point and I think he can speak to

19  the details.  But just so you hear from me on it, what I can

20  tell your Honor is that one of the AUSAs who was involved in

21  the case is out on maternity leave and there were efforts made

22  to have her come back into the office and start reviewing her

23  e-mail as part of sort of an all-hands-on-deck scrub of the

24  file to ensure that there was nothing further or if there was

25  anything further that needed to be disclosed, that we found it.

I5h9piz1

1          So from my perspective I would offer the Court that

2     when we're in this situation we have the highest obligation to

3     make things right.  And I think that there were dual efforts,

4     both to understand what happened with the late May 4 disclosure

5     but simultaneously to do a full scrub to satisfy ourselves and

6     then the Court and the defense that there was no stone

7     unturned, that we had the done the additional work necessary to

8     look.

9          So, I am aware that as a result of those further

10    e-mail searches that an additional piece of information was

11    located, that then prompted a follow-up disclosure.

12         I would also -- and, again, this is by no means of

13    excuse but I think one of the lessons learned by our office in

14    this particular case is that the vast majority of our violence

15    work, murder cases, are often initiated in a manner that's

16    cooperator-based where the way that it comes in, the timing in

17    which we learn of information is not a trying to solve a

18    whodunit in real time.

19         There was some unique aspects of this case.  As you

20    know, the murder victim was a federal cooperator.  It was --

21    there was a very urgent response by our office together with

22    various pieces of law enforcement to try to figure out who had

23    killed a federal cooperator and why.  And that is a smaller --

24    a very small slice of a unique scenario; that is, the majority

25    of violence cases that we handle do not come in and present in

I5h9piz1

that fashion.

         And I think that there was, perhaps, a lack of
adequate systems in place or sufficient awareness that when you
have a very fast-moving, multifaceted whodunit investigation of
this type, that there needs to be significant appreciation
along the way of how you identify, set aside, don't forget
about the various different tentacles that may arise along the
way in that type of fast-paced investigation.

         So that is a learning point.  That is a training
point.  That is one of the points on which every AUSA is being
trained.

         But it did come up in a case where I think, not to our
credit, but to acknowledge it and to own it, there was some
sloppiness in or inadvertence in the manner in which that
information of any suspect identified from every source and
ruled out was maintained.  Was it forgotten six months later in
an e-mail count?  Was it set aside in a file?

         I do know -- I will note, too, that this is not --
there were some Brady disclosures made in this case months ago.
I think that one of the errors made was that even though very
substantive information was provided to the defense, in
retrospect it should have been accompanied not just by a
letter, a disclosure letter but by further scrubbing of the
files at that time to see if there were any underlying
documents or investigative reports that went along with that

I5h9piz1

1   disclosure that provided more detail about the disclosure.

2            That's another training point on which every AUSA is

3   being trained in the office this week.

4            THE COURT:  And, again, this may be for Mr. Swergold,

5   but relatedly, I don't know if you're aware but presume that

6   you are, that the government actually here filed a motion in

7   limine seeking to preclude the defense from offering any

8   alternate perpetrator defense for which there was insufficient

9   evidence.  And it's always -- it bothered me on May 7 and it

10  continues to bother me and it could just be coincidence, but it

11  raises a question that an affirmative motion is being made to

12  preclude the defense from speculating wildly without nexus or

13  evidence as to alternate perpetrators while the government has

14  in its possession, very real, very substantial, though the

15  government disbelieves it, but of course that's irrelevant to

16  the Brady analysis, evidence of the involvement of other

17  individuals.

18           And I do want assurance that those two things didn't

19  happen in conjunction; that the government isn't saying while

20  it's withholding information that could lead to investigative

21  lines, that the defense should be precluded from speculating as

22  to any alternate perpetrators.

23           MS. ZORNBERG:  Based on all of the attention that I've

24  personally given this matter over the last week you have my

25  assurance, first of all, that I have found -- I have found no

I5h9piz1

1   indication or suggestion that those two were linked as part of

2   a willful effort.  I think that this was product of

3   inadvertence and sloppiness and of thoughtlessness by AUSAs who

4   are exceptionally hard-working and exceptionally honorable and

5   in whom I have tremendous confidence and who have lost a

6   tremendous amount of sleep over these inadvertent errors and

7   working around the clock to try to make them right.

8           You also, your Honor, have my assurance that I will

9   continue to go back and speak in this case with the chiefs of

10  our violent crime unit about the motion in limine briefing and

11  the regretful position that we're in now for having that, that

12  seeming contradiction of the position that we took before your

13  Honor that is now quite in tension with disclosures that were

14  made by the office.

15          So I appreciate the seriousness of that.  I remain

16  steadfast in my belief that these errors were not intentionally

17  in bad faith.

18          THE COURT:  Thank you.

19          Who will I hear from for the defense?  Ms. Macedonia?

20  Ms. Sanderson?

21          Ms. Sternheim.

22          These are not separate issues, obviously, for the

23  reasons I've articulated.  But it is the case -- I have found

24  no authority, and you cite me none, for the proposition that

25  the -- in light of the pretrial but late disclosures of the

I5h9piz1

1    government would necessitate the dismissal of an indictment.

2           I think in the -- certainly in the absence of any

3    affirmative showing by the defense as to bad faith or willful

4    withholding and then, as you've seen, I'm probing that, and

5    perhaps even in the face of that, though there would be

6    obviously very serious other repercussions for the attorneys

7    involved.

8           So, what is the authority for the proposition that a

9    pretrial but late disclosure under the circumstances that we're

10   presented with here would require a dismissal of a very serious

11   indictment?

12          MS. STERNHEIM:  Your Honor, I'm not prepared to give

13   you citations at the moment, although we will provide those to

14   you.  But the analysis, I believe, starts from the Brady

15   violation which speaks for itself.  The spoliation issues --

16          THE COURT:  To stop you on that.  Brady is, as a

17   violation, is necessarily a backward-looking analysis.

18          Did the disclosure and the absence of the availability

19   of that information lead to an unfair trial?  It's examined

20   after the fact.

21          We have the information now.  So we will proceed to a

22   fair trial with the information in hand.

23          MS. STERNHEIM:  Well, we will proceed to trial but in

24   the interim period between being appraised of this information,

25   avenues of investigation have been closed to us, which has

I5h9piz1

1    eliminated viable evidence that we would have put forth.

2              When we speak about a pretrial situation such as this,

3    it is not going to lend itself to appellate decisions that

4    would be handy to cite to the Court.  This is an unusual

5    situation.

6              In spoliation situations where evidence has been

7    destroyed, cases have been dismissed, instructions have been

8    given concerning inferences.

9              I was prepared to speak to the Court on the very issue

10   that your Honor just brought up.  It has always disturbed us

11   that the government preemptively moved to preclude us from a

12   viable defense and threw the gauntlet down that we needed a

13   good faith basis if we were to pursue this.  I view it as if

14   they dealt the cards but they held back the ones that would

15   have made it a fair game.

16             The coincidence of their moving and the existence of

17   the information that provides the good faith and brings us

18   before the Court today is too coincidental for me to be or for

19   us to be confident that there is no connection whatsoever, and

20   that is quite disturbing to us.

21             As I said before, this is an extraordinary situation,

22   one that my colleagues and I have not had, and we have been

23   practicing in this courthouse for decades.  The only other

24   time, I was telling Ms. Zornberg, that I had a situation like

25   this was a trial I had before Judge Motley when Rudolph

I5h9piz1

1    Giuliani came into the courtroom and we were called to the

2    robing room because one of the assistants had taken all the

3    drugs in the case and basically snorted it, and we had to deal

4    with those situations.

5        So, none of us take this lightly or with any sense of

6    happiness.  It is extremely disturbing and we feel that it is

7    egregious enough to be tantamount to denying our clients a fair

8    trial, even with an adjournment and for the reasons stated in

9    our papers, and we will supplement them if the Court wishes,

10   that the appropriate remedy here is dismissal.

11       THE COURT:  Let me just press you, Ms. Sternheim.  I

12   think the government makes this point in its papers and it

13   occurs to me if the government had continued to withhold this

14   information, we proceeded to trial, the defendants are

15   convicted, and then the information surfaces and it's concluded

16   that there was a Brady violation, the remedy is a new trial.

17       MS. STERNHEIM:  Your Honor, that's only a partial

18   remedy.  The Court may grant a new trial.  But if we could

19   establish that it resulted in a due process violation that

20   foreclosed us from effectively using that which was not

21   disclosed, there would be another basis for dismissal.

22       THE COURT:  Well, I don't see any authority on that.

23       And on your showing with respect to the spoliation

24   contention, here is the -- I mean I think there's a number of

25   difficulties.  Number one, you've surfaced the -- I think two

I5h9piz1

primary categories, right.  You've got Guillen who has been

indicted and convicted of other charges who is represented by

counsel and who would plead the Fifth.

There is no indication that if the government turned

over the September 30 investigative report one month, two

months, six months, eight months, ten months ago, that you

would have faced any different set of circumstances than you

face now, and it seems to me unlikely.

And the same with respect to the social media

information that you've said accounts -- some of the new names

that we've learned about and that have surfaced.  To the extent

that those social media accounts no longer exist, once again,

there is no showing that that wouldn't have been the case.  And

it's inconceivable to me that had the government turned over

all of this information, even two months ago, that you would

have made a contention that the indictment should be dismissed.

And there's been no showing that in any interim period of time

between when the government should have disclosed it and when

they, in fact, did that the spoliation concerns that you've

raised are the result of that time period as opposed to a

reality of the circumstances you would have otherwise faced if

there had been a timely disclosure.

MS. STERNHEIM:  Your Honor, it is somewhat of a

hypothetical and it could be answered both ways but I have --

THE COURT:  Surely, for the -- we do know from the

I5h9piz1

1    Circuit that the dismissal of an indictment -- and this is

2    obviously a very serious set of charges -- is an extraordinary,

3    rarely taken measure.  Surely the showing, the burden of making

4    such a showing as to any harm to the defendants as a result of

5    the delay falls on you, and you've not made such a showing.

6          MS. STERNHEIM:  Your Honor, I would also point out

7    that in the balance here this is not, as the government would

8    like the Court to believe, one instance of negligence.  It is a

9    continuing pattern of negligence.  And that in and of itself

10   raises the specter that warrants a remedy and we believe the

11   remedy is dismissal.

12         THE COURT:  Who of the assistants want to take the --

13   Mr. Swergold.

14         MR. SWERGOLD:  Yes, your Honor.

15         I'm happy to respond to any specific questions the

16   Court has either from its order yesterday, following up from

17   anything that was said today, or also to address any of the

18   points raised by the defense.  I'm happy to take the Court's

19   direction as to where you'd like me to start.

20         THE COURT:  Why don't we first focus on just the

21   immediate motion and the point which I didn't take up with,

22   because it goes to the merits of the motion, with Ms. Zornberg,

23   the defense's contention that the government's disclosure

24   failures here have prejudiced them in a way that can't be

25   solved by an adjournment because they've lost access to

I5h9piz1

1    information that they would have otherwise had.

2              MR. SWERGOLD:  OK, your Honor.

3              We obviously disagree with the contention that they've

4    lost access to information.  We don't think they've made the

5    required showing.  I think Ms. Sternheim said it was somewhat

6    of a hypothetical.  I don't think that meets the standard.  And

7    what I'll say is that the crimes that are charged in this case,

8    this is not an example of, say, like an ongoing wire fraud or a

9    securities fraud taking place within a company where it's --

10   these are discrete points in time that are all captured on

11   video.  That video is all preserved.  The defendants have it.

12   There are -- there is OPR data for the cars in the vicinity.

13   The defendants have it.  There is the cell tower dumps which

14   would show any phones using those cell towers, both at the

15   location where the robbery, kidnapping took place and the

16   location where the body was recovered.  There's video from the

17   body recovery site as well.  So these cell towers would show

18   phones using those as well as numbers that phones using those

19   dialed or received calls from.  And so -- look, the government,

20   as we have set forth --

21             THE COURT:  I don't know what the point of any of that

22   is to the analysis that I'm undertaking and, frankly, it seems

23   to me it is symptomatic of exactly the same thing which has

24   produced the problems that we find ourselves with now, which is

25   that the government's got its view of the evidence.  I

I5h9piz1

1   understand that.  You're probably going to get to put on a

2   trial about that.  That, as you I hope know by now, is

3   irrelevant to the Brady obligations to turn over potentially

4   exculpatory information.  It doesn't matter a lick that you

5   find that information not helpful to your case.  That's the

6   point.

7           So why don't you try to focus on the question,

8   Mr. Swergold, as to where there is now new information that the

9   defense may legitimately want to use in their defense that they

10  claim that the government's failure to turn over what you --

11  you do now -- you admit, as I mean Mr. Lenow has told me in his

12  letter but I'd like to hear it from you -- that this is

13  material that the government was required to turn over.

14          MR. SWERGOLD:  Absolutely it was, your Honor.

15          THE COURT:  So then the question is -- and it does

16  open up new lines of investigation for the defense.

17          MR. SWERGOLD:  Absolutely, your Honor.

18          THE COURT:  So then the question is has the failure,

19  the delay, the time delay in the government's error,

20  substantial error, irreparably harmed the defendants' ability

21  to defend themselves in the way that they wish to defend

22  themselves.

23          MR. SWERGOLD:  The answer to that is no, your Honor.

24  And I tried to answer it in a roundabout way.

25          There are --

I5h9piz1

1          THE COURT:  But, a telling roundabout way.

2          MR. SWERGOLD:  Your Honor, I did not --

3          THE COURT:  Do you see that, Mr. Swergold?

4          MR. SWERGOLD:  Your Honor, I did not mean to suggest

5     at all that what the government was -- what I was standing up

6     and saying is we have our view of the evidence and the

7     defendants, and we're discounting the credibility of the other

8     avenues of investigation.

9          What I meant to say, your Honor, is that they have the

10    new information and to the extent that the defendants want to

11    use the existing evidence that preserved the crime scene to see

12    whether -- to see whether those individuals were there, to see

13    whether they're in contact with people, that's all I'm saying,

14    your Honor.  Those avenues of investigation are still available

15    to the defendants because the events of that night have been

16    preserved.  That's all I'm saying.

17         In their letter, the defendants are saying that

18    they're not able to speak with these individuals.  I do think

19    it's a little bit counterfactual because -- I think it does --

20    it's a little implausible to think that drug dealers on the

21    street who are engaged in violence and drug dealing, had they

22    been approached by a defense lawyer or a defense lawyer's

23    private investigator would simply say, yeah, I'm happy to talk

24    to you, you know, ask me any questions you want about a murder

25    that you're investigating.  The fact that they have lawyers

I5h9piz1

help them make that decision now I don't think changes the
equation.  I don't think there can be a showing that these
individuals would have necessarily spoken to them at the time.

I will note that a number of the individuals in the
Second Avenue -- the second piece of information, that's the
one that we've referred to as the Danny cooperator, the people
who are named, that the identities are known, are not in
custody now and were not in custody then and are not in custody
now.  The people who provided the information or -- and the
second level of communication, the Danny cooperator heard it
from somebody.  Those two people were in custody then and are
in custody now.  One individual who is in custody has since
been released.  We've given the defense his parole officer's
name if they want to try to track him down.  We don't have that
person's contact information.

The point I was making, your Honor, is not to say we
see the evidence one way.  It was to say that to the extent
that the defense wants to investigate these individuals'
involvement in the crime, the events of that night and the
surrounding time period has been preserved and produced in
discovery and so they can do that investigation.  They can see
what cars were on the block at the time, what phones were being
used, what people were walking on the street.  All of that is
available to them and with time they can make that
investigation.

I5h9piz1

1              THE COURT:  Thank you.

2              When was Guillen indicted?

3              MR. SWERGOLD:  He was arrested in August of 2017.  I

4     think the indictment probably came right before then.

5              THE COURT:  Let me ask you -- you heard me pose to

6     Ms. Sternheim the I think reality that the remedy for a Brady

7     violation posttrial is new trial and so it almost falls as a

8     logical matter that the remedy for a late disclosure is an

9     adjournment.  But at some point that pushes up against speedy

10    trial rights.  And I suppose my -- the other end -- the other

11    end of the spectrum of that question to you is:  What happens

12    if we adjourn for however amount of time the defense thinks

13    it's necessary to follow it and then we get again the Friday

14    before trial and the government says and here is more

15    information that we should have turned over but didn't.  And

16    then they say but you know if the defense requires an

17    adjournment, then that time should be excluded and we go on and

18    on.

19             At what point -- how would you measure, how would you

20    state the analysis for at what point the late disclosures

21    burdens the -- both the fairness of the trial and the speedy

22    trial rights.

23             MR. SWERGOLD:  Your Honor, I think on the speedy trial

24    analysis there's, obviously, two pieces to it, the

25    constitutional speedy trial analysis under the Sixth Amendment

I5h9piz1

1    and then just the Speedy Trial Act 70-day requirement.

2            I don't --

3            THE COURT:  So start with the statute.

4            Why in light of -- and this was the question I posed

5    in the order -- why in light of what has occurred here, the

6    government's fault for delay, why would I exclude time?

7            MR. SWERGOLD:  Right.  So, your Honor, there's a full

8    70 days left on the clock.  And so if your Honor wants to set a

9    trial within that time period, the government would not ask to

10   exclude time.  If the defense, however, wants time beyond the

11   70 days, I think then we get into an area where the interests

12   of justice require the exclusion of time because if the Court

13   is going to dismiss the indictment for a due process violation,

14   that's a different inquiry.  And if that's what the Court's

15   going to do, then that's what the Court is going to do.  But if

16   the Court is going to deny that motion to dismiss, then the

17   defendants' -- the Speedy Trial Act doesn't work in a way in

18   which the defendants can simply run out the clock by saying we

19   want more than 70 days, we strenuously object to the exclusion

20   of time, which obviously your Honor can overrule anyway.  So if

21   it's within 70 --

22           THE COURT:  And the constitutional analysis.

23           MR. SWERGOLD:  Your Honor, at this point the

24   defense -- I mean it's been 14 months since the defendants were

25   indicted.  Certainly -- I tried to do a little research on this

I5h9piz1

1    this morning.  I did find an Eastern District of Pennsylvania

2    case where under the factor analysis for constitutional -- we

3    certainly are not at an extensive delay at this point, given a

4    trial of this nature, for it to take place 14, 15, 16, 17

5    months.

6              THE COURT:  Not unusual.

7              MR. SWERGOLD:  But if we were in a position where

8    continued disclosures kept delaying a trial, then under the

9    prejudice -- I mean that would weigh against the government in

10   a prejudice analysis should we ever come to that point down the

11   road under the constitutional inquiry.  And in that case that I

12   found it just -- it happened to be the case where I think

13   something like four years.

14             THE COURT:  I saw that case.

15             MR. SWERGOLD:  So I hope that answers your Honor's

16   question on that point.  And, of course, I'm more than happy to

17   answer any of the other questions that your Honor asked.

18             THE COURT:  Let me put to you the question about the

19   motion in limine which was an unusual motion in limine and

20   stands out now as -- what's the right word -- a troubling

21   contrast with the failure of the government to produce

22   precisely what the government claimed defense did not have.

23             MR. SWERGOLD:  I understand.

24             THE COURT:  So what was your level of knowledge at the

25   time of making that motion as to the materials that have

I5h9piz1

1 subsequently been produced?

2           MR. SWERGOLD:  Your Honor, the level of knowledge

3 differs among various members of the team and I'm happy to

4 address that in turn as well as to talk about, again, the

5 knowledge and why it wasn't turned over.  I understand the

6 Court's view that it's troubling.  I can see why, given the

7 timing of the disclosures and us making the motion.  I can

8 assure the Court that in no way were we trying to say to the

9 defendants you can't do this and we're withholding information

10 from you, knowingly withholding information from you.

11           THE COURT:  I think I asked this on the 7th but

12 maybe you didn't answer.  I don't recall your answer.  What did

13 you have in mind?  What was the defense line and who were the

14 individuals you were thinking about when you made that motion?

15           MR. SWERGOLD:  We were thinking about Merlin Alston

16 and Gabriel Guillen.  I wrote that motion, your Honor.  That's

17 what I was thinking about.  And I don't think we went into real

18 specifics about it.  We just talked generally about the fact

19 that he was a cooperating witness.  But I was thinking about

20 Merlin Alston, because that's the person that the trial was

21 coming up against, and Gabriel Guillen.  And I did that, your

22 Honor, based on -- I was added to this trial team on March 28,

23 2018.  I did everything I could to get up to speed on this case

24 as quickly as I could.  I read all our disclosures letters.  I

25 read our discovery letters.  I reviewed the discovery.  I tried

I5h9piz1

1    to get as familiar as I could about the facts of the case.  I

2    personally did not know about some of the things that we've

3    since turned over.  Other people --

4              THE COURT:  You said some of them.

5              MR. SWERGOLD:  No.  Actually, your Honor, I did not

6    know about anything that the government has turned over since

7    May 7 which was in your Honor's order of last night.

8              THE COURT:  So that implies you did know what was

9    turned over on May 4.

10             MR. SWERGOLD:  No.  I did not know that.

11             THE COURT:  You said May 7 so I wanted to make sure I

12   understood.

13             MR. SWERGOLD:  Your Honor, I was not aware.  I did not

14   know.  I did not know about the DEA-6 that memorialized the

15   confession that the CI had received.  I knew about the

16   recording.  I knew about the text messages, because I had

17   reviewed the discovery, and I knew about the disclosure letters

18   in which we said that there was a confession that had taken

19   place and then the subsequent disclosure letters talking about

20   the issues with the CI's credibility and whether or not those

21   text messages were true.  I did not know about the existence of

22   the --

23             THE COURT:  And the representations in the face of

24   direct questions from the defense, if there was anything

25   further with respect to Guillen's confession, who made those?

I5h9piz1

1          MR. SWERGOLD:  The initial -- any one that predated

2      March 28 was made by Ms. Graham, Ms. Fender, and Mr. Lenow.

3      And the one that was asked to us after, which I think was in

4      early April, was -- I had been added to the team at that point.

5      I was not aware of the underlying DEA-6.  I will say that I --

6      our -- I was not aware of the underlying DEA-6.  Should I have

7      said I want to review literally every piece of paper in this

8      case and every piece of paper in the Guillen case at that time,

9      in retrospect, obviously I should have done that.

10          THE COURT:  So when you had Guillen in mind when you

11      made that motion your representation now is that you were

12      unaware of any additional information in the government's files

13      that might have provided that access to the defense that you

14      were arguing would preclude them from raising it.

15          MR. SWERGOLD:  Right.  When I wrote that motion, your

16      Honor, I had in mind the disclosure letter in which we said

17      there was recorded meetings and text messages in which Guillen

18      had confessed to the crime.  So I had that disclosure in mind.

19      I had the recording in mind.  I had the text messages in mind.

20          Again, I wrote the motion.  I wrote that motion.  As a

21      trial team, we submitted one motion and all reviewed each

22      other's work.  As we've already admitted over and over again,

23      the error with respect to the Guillen piece was that when we

24      were saying to the defense we've already given you -- we've

25      already given it to you, we were thinking we've already told

I5h9piz1

1  you about the fact of the confession and at every moment at

2  that point in time we should have gone back in the file and

3  said wait a minute let's just go back and make sure that we

4  have scrubbed our file, that there is nothing else related to

5  that Guillen confession.  Because what we meant -- what I

6  understand from my team members was meant in the letters where

7  we said that we have -- that there's nothing else from the CI

8  is that apart from the confession which, again, we should have

9  turned over the DEA-6, we should have gone back and found it,

10  that the CI had not provided himself --

11        THE COURT:  Frankly, you shouldn't have -- I hope this

12  is part of the changes, but you shouldn't have needed to find

13  it.  It should have been in a <u>Brady</u> file as soon as it came in,

14  obviously.

15        MR. SWERGOLD:  Yes.

16        To that end, your Honor, to the separate disclosure on

17  the, again, what we've termed the Danny cooperator, this is

18  something that Ms. Zornberg spoke to a little bit, is that

19  another change that absolutely needs to be made and is

20  particularly important in the small universe of cases where we

21  are dealing with a realtime crime like this case is that when

22  pieces of information come to us and we send an agent or a

23  detective to run it down real quick like we did here, that

24  information is then set aside in a folder or in some

25  organizational structure so that whenever -- however many

I5h9piz1

months or years down the line that we've solved the case or we

believe we've solved the case and we bring charges against

people that we believe did it and it's time to start making

disclosures to that person, we can just go right back to that

because with respect -- it's a different mistake with respect

to the Danny cooperator.  It was the failure to flag at the

time it came in, which was about six months before this case

was charged, that this is something that now must be on our

mind when we eventually charge a case here.  And because of

that mistake at the outset, at every step when we were

providing disclosures, when we were making -- when we were

making the motion in limine, I personally did not know about

it, the members of the team who did know about it just did not

remember it because it happened so quickly in the early stages

of the investigation and our mistake, and an office practice

that we have been trained on and is going to be made better is

making sure that that information is flagged at the outset so

that it is available and on everybody's mind when the time

comes to make a disclosure.

THE COURT:  And on May 7 when you pretty strenuously

opposed the adjournment what was the level of awareness as to

what work still needed to be done?

MR. SWERGOLD:  As we came out of the May 7 conference,

your Honor, we realized that we needed to go back and as

quickly as possible, but in a very systematic and methodical

I5h9piz1

1    way to avoid any mistakes, needed to go back and pull every

2    single thing in which, as Ms. Zornberg alluded to, included

3    e-mails and files from the AUSA, Ms. Graham, who has gone out

4    on maternity leave.  She just gave birth less than a month ago.

5    We had her come into the office with her baby and review every

6    one of her hard copy files.  That happened this week.

7             And it was in the process of doing that that we --

8    that we found the information that, again, should have been

9    noted earlier at the time it came in related to the Danny

10   cooperator, and turned that over immediately, like absolutely

11   immediately.

12            Any time that we found anything in now reviewing all

13   of our hard copy files, our e-mails, the DEA's files, the

14   NYPD's files.

15            As your Honor may have seen, and in response to the

16   defense requests, we have reached out to other prosecutors'

17   offices to see if they have proffer notes related to the Danny

18   cooperator that are completely unrelated to the Bishun

19   investigation.  We've obtained those.  We've turned those over.

20            We've immediately informed witnesses, lawyers, that we

21   are going to be making attorney-eyes-only disclosures about

22   individuals' names that we otherwise, you know, because of

23   serious safety concerns and in earlier parts of the

24   investigation we would not.

25            And so we treated this -- we knew right away that this

I5h9piz1

1    was something that we had to go back, we had to figure this

2    out, and that's why since May 7 we have produced information to

3    the defense.

4             A fair amount of it has been in response to their

5    requests like rap sheets or phone records, but there are

6    things, the Danny cooperator, there was a cooperator in a

7    separate investigation.  We went through and looked at all of

8    that person's notes and that's when we found the two lines in

9    the proffer notes that we put in a letter to the Court

10   saying -- again, I was not aware of that, Mr. Lenow was not

11   aware of that, that was something from the case that was being

12   run by Ms. Fender and Ms. Graham, as soon as we found that we

13   turned it over.  We sent a letter to the Court saying

14   regardless of what you make of what this note says from this

15   cooperator, absolutely should have been in the narrative on

16   May 7.  If it was on people's minds we, of course, would have

17   done it.

18            And, again, your Honor this all speaks to the mistakes

19   that were made that were not deliberate and not willful and not

20   a product of any intention to withhold anything but just a

21   failure by the members of our team to make sure that we are

22   doing it right.

23            And we have tried as hard as we can through, as

24   Ms. Zornberg said, many sleepless nights to make sure that we

25   have scrubbed everything now.  We had the NYPD go back and

I5h9piz1

1    check every -- for the existence of any crime stopper tip, you

2    know, that could have possibly come in on this.  They've

3    assured us that none have come in.  We've checked with other

4    prosecutors for their proffer notes.  We've checked with other

5    agents and we are taking this extremely seriously.

6                    (Continued on next page)

I5HQPIZ2

1         THE COURT:  Ms. Fender, do you want to speak to what

2    you knew?

3         MS. FENDER:  Yes, your Honor.  Thank you.

4         Your Honor, I think, as is obviously clear at this

5    point, enormous mistakes have been made, and by myself in

6    particular, because I was involved in the Gabriel Guillen

7    investigation as well, and all I can say is at this point it is

8    very clear that the way in which we proceed with these

9    investigations, just as Mr. Swergold said, when we made the

10   disclosure in the December letter that we've discussed a lot

11   about the confession to Mr. -- well, Mr. Guillen's alleged

12   confession, that we made that disclosure trying to do what we

13   thought we should do, which was get the information out there,

14   and made the mistake of not going back.  What happened in my

15   mind is, frankly, just a mistake of not thinking about what the

16   underlying source of that information was and never going back

17   to check.

18        As far as the Danny cooperator, again, just as

19   Mr. Swergold said, that was something that was a blip on the

20   radar.  Obviously, an incredibly important blip that should

21   have been turned over and compartmentalized in an appropriate

22   fashion but one that passed through our knowledge and was not

23   captured appropriately at the time.  So, as I hope has been

24   made clear here, we have taken incredibly seriously our need to

25   make absolutely sure that we have chased down every possible

I5HQPIZ2

1    source of any other alternate perpetrator evidence, anything

2    that even remotely resembles the information that the defense

3    is seeking, and tried to get our hands around that.

4              All I can say is, your Honor, we strive for

5    perfection.  We are human.  I am human.  This is a huge mistake

6    and one that you will never see repeated again from myself or

7    Ms. Graham or anybody on this team because I cannot tell you

8    how seriously we are taking this.  But there has never been a

9    point at any point where we intentionally determined to

10   withhold information.  That's just not what happened here.

11             THE COURT:  Thank you.

12             Any other defense counsel want to speak to the motion

13   in hand?

14             Ms. Macedonio.

15             MS. MACEDONIO:  May we have a moment to discuss

16   amongst ourselves?

17             THE COURT:  You may.  I'll step down for a moment.

18             MS. MACEDONIO:  Thank you.

19             (Recess)

20             THE COURT:  Ms. Macedonio.

21             MS. MACEDONIO:  The defense takes issue with the idea

22   that this was merely an issue of training.  I think to fully

23   flesh that out, we need to think about the history of this

24   entire situation.

25             On September 20 of 2016, Robert Bishun was killed.

I5HQPIZ2

1          On September 27 of 2016, a confidential informant

2     advises Mercurio, Special Agent Mercurio, that he has obtained

3     a detailed confession from Gabriel Guillen.  In that

4     confession, Guillen implicates not only himself but three other

5     individuals.  That's September 27, one week after the homicide.

6          Thereafter, the government --

7          THE COURT:  More than three other individuals.  It

8     implicates Tapia, the brother, the two named individuals.

9          MS. MACEDONIO:  Right.

10         THE COURT:  Or three named individuals and two others

11    unnamed.

12         MS. MACEDONIO:  But there are four individuals that

13    Gabriel Guillen names who are later indicted in the Guillen

14    indictment which is currently pending in front of Judge Wood.

15         After this confession is given to Special Agent

16    Mercurio, the government sees fit to wire up the informant in

17    the hopes that he will get Guillen to confess while on tape.

18    They also go back and retrieve video surveillance which

19    corroborates what the informant had said that Guillen had

20    confessed to, because ---

21         THE COURT:  Car passing guy.

22         MS. MACEDONIO:  Car passing by the auto body shop.  So

23    they wire him up.  He goes out.  There's a conversation that he

24    has with Guillen.

25         Also, the government uses this information to obtain

I5HQPIZ2

other investigative leads.  So they, in affidavits and things
of that nature, use at least some of the information that the
informant has given them to get cell site information and other
information in the course of the investigation of Gabriel
Guillen.

     Thereafter, in March of 2017, these two defendants are
arrested for the Bishun homicide.

     In August of 2017, Gabriel Guillen and the three
others who he mentioned during his confession are arrested and
charged in a narcotics case in front of Judge Wood.

     During the course of our investigation the last couple
of weeks, I have come to learn that the attorneys in that case
were told by some of the same prosecution members at this table
that their clients were being investigated for a homicide.

     On December 11 of 2017, the government turns over to
us the recorded conversation between Gabriel Guillen and the CI
and the text messages.  Now, it should have --

     THE COURT:  They still had no reason to think it's a
false confession.  They didn't think it was a false confession
at that point, right?  It isn't until April or whatever.

     MS. MACEDONIO:  Right.  Still no reason to think it
was a false confession.  Still no reason to think text messages
were fabricated.  But at some point it should have dawned on
the prosecutors in this case, why did we wire this guy up?  He
must have told us something and where is that report?  It

I5HQPIZ2

1    wasn't just he wandered into the office and we said "Here's a

2    wire, go out and see what you can get on Gabriel Guillen."

3    There was an underlying reason.  And so in December --

4              THE COURT:  The underlying reason is that --

5              MS. MACEDONIO:  Confession.

6              THE COURT:  Yes, which they in their minds had

7    disclosed in that December 13 letter.

8              MS. MACEDONIO:  I don't even see how that's possible

9    given the details of the confession that Special Agent

10   Mercurio --

11             THE COURT:  Well, I understand, and I've ruled --

12             MS. MACEDONIO:  Right.

13             THE COURT:  -- in adjourning the trial that they

14   didn't give everything that they needed to give and that it

15   opened up other lines of investigation, but it is true in

16   response to the question you're raising, well, it must have

17   occurred to them that something happened that caused them to

18   wire up the CI, and the answer is yes, it was the fact that

19   Guillen had testified to this murder and, again, in their minds

20   they thought that they had disclosed and they had, in fact,

21   disclosed that.

22             MS. MACEDONIO:  My review of that transcript --

23             THE COURT:  Not the transcript.  It's in the letter.

24   It's the statement in the letter.  We can pull it up.  Again,

25   it's not enough, but it says "recorded and text statements made

I5HQPIZ2

1   to a confidential informant by another individual who stated to

2   CI-1 in the course of meetings and text message exchanges, in

3   substance and in part, that Individual A and others were

4   involved in the murder of Robert Bishun."

5            MS. MACEDONIO:  So, we then pressed the government.

6   We're moving forward now.  We pressed the government.  First

7   Mr. Freeman did it, and we get back consistently --

8            THE COURT:  There's nothing.

9            MS. MACEDONIO:  -- there's nothing more.  No one says,

10  again, "How can we wire this guy up?"  But they do indicate to

11  us that there were meetings.  So at some point we focus in on

12  what were the meetings, plural, and again we're told "We're

13  giving you nothing else.  You get nothing else."

14           It's not until we file requesting an order from the

15  Court that they give us the rest of the material that someone

16  in this office pauses and says, "Wait a minute.  There must be

17  something else."  So we're taking issue with the idea that this

18  is simply a matter of training.  We have prosecutors at this

19  table who were involved in both investigations, and we think at

20  a minimum it was neglect to the extent that it raises a level

21  of negligence that requires this Court to exercise its

22  supervisory powers and dismiss the indictment.

23           THE COURT:  On what authority do you think I can

24  because of a high level of negligence dismiss the indictment?

25           MS. MACEDONIO:  Judge, I don't have a case to cite to

I5HQPIZ2

1   you at my fingertips.

2              THE COURT:  You've looked.  It's not there.  In fact,

3   what we have is it talks about how extraordinary a remedy it is

4   to dismiss an indictment, and I haven't found -- and you

5   haven't found, because you would have cited it to me if you

6   had -- anything even closely approximating this that would

7   allow me a basis to conclude that I should dismiss this

8   indictment.

9              I mean, negligence may well be what we have, and there

10  are repercussions to negligence, but negligence is not the

11  standard for the dismissal of an extremely serious indictment

12  for which there is evidence of these defendants' involvement

13  and that the matter is to be tried by a jury.

14             There was a bail hearing.  Mr. Pizarro has pressed

15  both his innocence and his request for a speedy trial at every

16  moment that he's been in court in front of me.  I take that

17  very seriously, as I know counsel does, but it doesn't answer

18  the remedy question if what we have is negligence and

19  incompetence and error on the part of the government rather

20  than a willful, intentional bad faith failure to meet its

21  obligations.

22             MS. MACEDONIO:  Judge, there has to be at some point

23  some deterrent right?  The government --

24             THE COURT:  Yes, there has to be deterrent.  Look,

25  there are -- I don't know maybe this is a question for

I5HQPIZ2

Ms. Zornberg.  These kinds of things do sometimes lead to OPR

investigations.  I don't know if that has occurred or is being

considered here.  There's consideration in Congress now as to

bills to allow for civil lawsuits against prosecutors who

withhold exculpatory information.  There has to be deterrence.

It doesn't mean that negligence is the standard for

dismissal of a very serious indictment, and I just don't see

any authority for that proposition.  What I see is

statements -- I see an absence of that, and there are certainly

other instances of prosecutors failing, as these prosecutors

have.  There are lots of instances of *Brady* violations where

comparable material comes out after trial and retrial is the

solution.

I don't see anything suggesting it appropriate here,

and I see a standard for dismissal as being at the highest

level of a bar.  I obviously understand the defendants'

frustration, defense counsels' frustration.  Defense counsel

has been, as far as I can tell, extraordinarily diligent from

the record that's in front of me in pressing on precisely these

points based on what you learned and being told that nothing

more existed.  And I think at some level, as I did, assuming

that there was credibility behind those statements and yet

still pressing to the point of moving in front of me in a way

that produced what we have now.

All of that to say it is not on this record, not on

I5HQPIZ2

1    this showing, not on the absence of a showing of truly bad

2    faith and intentional willful withholding of known exculpatory

3    information could I begin to imagine that dismissal of the

4    indictment is the appropriate remedy, and that showing hasn't

5    been made.

6           With respect to the spoliation issues, again, I think

7    Ms. Sternheim sort of conceded that we just don't know but no

8    showing -- it is the defense's burden to establish that the

9    delay is what would cause an irreparable harm here and that

10   showing hasn't been made.

11          So it seems to me that the obvious solution at this

12   point is to figure out what resources defense counsel need and

13   what about a time they need to follow these investigative lines

14   to fruition and proceed to trial.  That is the question we are

15   faced with.

16          And I put in the order what we talked about in terms

17   of potential dates.  We were sort of back and forth on May 7 as

18   to whether it would be a two-week adjournment or August, and we

19   settled on the two-week adjournment.  So I will move whatever

20   needs to be moved to do this in a time that is expeditious but

21   allows the defense to pursue these lines, provide funding for

22   whatever resources you need so there can be no claim, as was

23   suggested in the defense motion, that there is any lack of

24   resources or manpower.  But I just see no basis, no authority,

25   no sufficient record made for the truly extraordinary remedy of

I5HQPIZ2

1    dismissal of the indictment.

2              So what, practically speaking, is the request?

3              MR. FREEMAN:  Your Honor, we have -- I thought my

4    voice would be loud enough.

5              THE COURT:  Nothing in this room survives without a

6    microphone.

7              MR. FREEMAN:  318 is worse.

8              THE COURT:  OK.

9              MR. FREEMAN:  We have a problem which I will put on

10   the record.  Based on today's ruling, and your understanding of

11   the case and the facts that have been laid out before you,

12   defense counsel need time to follow these paths of

13   investigation.  And we also need time, although I think we've

14   established it, but I think we need to nail down the nexus for

15   our alternate perpetrator defense.  My client, Mr. Pizarro, and

16   I think I speak for Mr. Rivera as well -- I do speak for

17   Mr. Rivera as well -- they're the ones that have been in jail

18   and they want to go now.  They are ready to go, and they're

19   incarcerated, and we need the time.

20             I think the solution is release on bail to allow this

21   issue to be solved by letting the defense lawyers and our

22   investigator follow these paths while the defendants are out on

23   bail.  When I say bail, I mean reasonable bail, not bail that

24   they can't meet.  And that's my first suggestion before we pick

25   a date.

I5HQPIZ2

1          THE COURT:  I'll hear from the government.

2          MR. SWERGOLD:  Your Honor, the government would oppose

3    a request for bail for both defendants.  I'm happy to do a full

4    bail argument now.

5          THE COURT:  I mean, we've had a bail argument, and I

6    guess the question, Mr. Freeman, and I made an analysis at the

7    time, I don't see, but I'll let you make an argument how

8    anything that has occurred affects the standard that I am

9    required to an apply in making the bail determination.  To the

10   extent that there is obviously alternate perpetrator evidence

11   that you're going to pursue, that seems to me not to weigh into

12   the strength of the evidence analysis that I engaged in 12

13   months ago or so.

14         MR. FREEMAN:  Well, I think this is an extraordinary

15   case and an extraordinary set of circumstances that have just

16   been laid out before the Court, and I think it demands an

17   extraordinary remedy.  Your Honor has ruled on the motion to

18   dismiss.

19         However, I think that the extraordinary remedy could

20   include release on bail, and I think it would be an appropriate

21   remedy under the circumstances.  And it would be done in a way

22   that would assure the Court and -- I don't know about the

23   government -- but I think would assure the Court that there is

24   no risk of flight or danger to the community.

25         So we're making that application.  The details would

I5HQPIZ2

1    be discussed separately, but we are making that application.

2            THE COURT:  Well, look, I'll let both sides brief the

3    bail issue.  As I sit here, I am unaware of any circumstances

4    that have changed that actually go into the bail analysis that

5    I'm required to apply.  I obviously recognize the extraordinary

6    nature of where we are.

7            MR. FREEMAN:  Judge, I think this is somewhat

8    speculative but I think it's accurate.  I think if we had

9    gotten the *Brady* material with respect to Guillen and with

10   respect to Alston, we would -- I should say Guillen and Danny

11   CW, I think that we would have made use much earlier and I

12   think the trial would have gone on on time, and I think that

13   the reason the trial is not going on time rests on the feet of

14   the government, and that does affect, I think, the bail

15   determination in the sense that our clients, should we get the

16   adjournment that we need, they're going to have to stay in jail

17   longer than was anticipated.

18           So that I think it does speak to strength of the

19   government's case, and I think it speaks to a delay in the

20   game, and I think that's unfortunate.

21           THE COURT:  I am not in a position to evaluate that.

22   You can brief it if you want.  Obviously, I sit skeptically of

23   it, not because I'm not concerned about what has occurred and

24   the effect that delay has on pretrial detention of Mr. Pizarro

25   and Mr. Rivera, but it is the case that the bail determination,

I5HQPIZ2

1    the assessment of those factors is what it is.  And 14 months

2    in detention is obviously concerning but not unusual for a case

3    like this, nor would I presume the additional time that's

4    needed.  But I will be happy to read any authority that you

5    want to cite me.  And I'll give the government a chance to

6    oppose it but I'll take that argument in writing.

7              When would you like to submit that?

8              MR. FREEMAN:  Your Honor, could we revisit that after

9    we decide what the trial date is?

10             THE COURT:  Yes.

11             MR. FREEMAN:  Right now I would like a moment to speak

12   with my client.

13             THE COURT:  OK.  I can step down again.  What I'd

14   asked for in my order was given the possibility certainly that

15   I would deny the motion that counsel confer and let me know

16   what the requested --

17             MR. FREEMAN:  Your Honor, we did confer amongst

18   ourselves, and we did confer with the government this morning.

19   However, the added piece is the need to speak to Mr. Pizarro

20   and to Mr. Rivera.

21             THE COURT:  Understood.  I'll give you that time and I

22   will step down for a few moments.

23             (Recess)

24             THE COURT:  Mr. Freeman.

25             MR. FREEMAN:  Your Honor, we -- that is, the

I5HQPIZ2

1    lawyers -- propose September 11.  The only way that we can

2    figure out a way to have Mr. Pizarro tried earlier would be if

3    the defendants are severed, in which case Mr. Pizarro's counsel

4    would be ready by July 16.

5          I don't know if Mr. Pizarro is going to consent to the

6    exclusion until that time.  I don't know if it's within the 70

7    day period or not.

8          THE COURT:  I think you're looking at July 30 as the

9    70-day period.

10          Ms. Sternheim, just so I hear your position.

11          MS. STERNHEIM:  Your Honor, as Mr. Freeman stated, the

12    attorneys having gone over this and considering the amount of

13    time that is needed to develop the information and obtain

14    information related to the newly disclosed information, that we

15    picked a date that would give us sufficient time

16    professionally, ethically and effectively to represent our

17    client in a case in which he faces life without the possibility

18    of parole.

19          THE COURT:  Yes.

20          MS. STERNHEIM:  We have picked a date, and in doing

21    so, we have shuffled other things to accommodate that.  But

22    that is the date that I believe will give us time to

23    effectively represent Mr. Rivera.  And that is our foremost

24    concern here.

25          THE COURT:  Mr. Swergold.

I5HQPIZ2

1      MR. SWERGOLD:  Your Honor, the government will be

2  prepared to try the case at whatever date is set by the Court.

3      On the issue of severance, I want to, of course, start

4  by saying that we are even having this discussion again because

5  of the mistakes made by the government, so I'm not seeking to

6  say we make mistakes and they don't get to sever.

7      What I will say though is that under the severance

8  analysis, which has already been extensively briefed before

9  your Honor, and for the reasons set forth in those motions, we

10  think a joint trial does make the most sense.  It will

11  literally be an identical trial against both defendants.

12      THE COURT:  And the government's -- I mean, what is

13  your position with respect to the exclusion of time?

14      MR. SWERGOLD:  I think I touched on this earlier, your

15  Honor.  If the trial was within the 70-day period, the

16  government would not seek to exclude time.  If the trial is

17  outside the 70-day period because the defense is asking for

18  that time in order to effectively prepare for trial, then that

19  would be an instance where even if the defendants themselves

20  objected to the exclusion of time, your Honor could, and the

21  government's position would be, that your Honor should grant

22  the exclusion in the interest of justice again because it can't

23  be a position -- the Speedy Trial Act does not work to allow

24  the dismissal of an indictment by saying we need time but you

25  can't exclude the time that we need.

I5HQPIZ2

<table>
<tr><td>1</td><td>THE COURT:  So in light of the fact that counsel has</td></tr>
<tr><td>2</td><td>indicated that they need until September 11, is the</td></tr>
<tr><td>3</td><td>government's position I should exclude from now until</td></tr>
<tr><td>4</td><td>September 11 if that's what I set trial for, or that I should</td></tr>
<tr><td>5</td><td>exclude between July 30 and September 11?</td></tr>
<tr><td>6</td><td>MR. SWERGOLD:  Your Honor, the government's position</td></tr>
<tr><td>7</td><td>would be that if they need the time until September 11 to</td></tr>
<tr><td>8</td><td>prepare for trial, then the exclusion of time should be through</td></tr>
<tr><td>9</td><td>the trial date.  Obviously, there needs to be an exclusion of</td></tr>
<tr><td>10</td><td>time sufficient so that the clock does not run out for the</td></tr>
<tr><td>11</td><td>purposes of the defendants preparing for trial.</td></tr>
<tr><td>12</td><td>THE COURT:  All right.</td></tr>
<tr><td>13</td><td>I understand the position of the defendants and I</td></tr>
<tr><td>14</td><td>understand the position of defense counsel.  What is most</td></tr>
<tr><td>15</td><td>important here is that the defense counsel are able to do</td></tr>
<tr><td>16</td><td>everything that they can to provide a strenuous and effective</td></tr>
<tr><td>17</td><td>defense of these defendants.</td></tr>
<tr><td>18</td><td>Obviously, I'm troubled by the delay, which is the</td></tr>
<tr><td>19</td><td>result of the government's conceded error.  I am troubled by</td></tr>
<tr><td>20</td><td>the fact that the defendants have pressed throughout for their</td></tr>
<tr><td>21</td><td>speedy trial, as I said before, and they face continued</td></tr>
<tr><td>22</td><td>pretrial incarceration, but I must ensure within my power that</td></tr>
<tr><td>23</td><td>we have a fair trial, and that means I will give defense</td></tr>
<tr><td>24</td><td>counsel the time that they need to do the investigation they</td></tr>
<tr><td>25</td><td>do.</td></tr>
</table>

I5HQPIZ2

1          I recognize, Mr. Rivera and Mr. Pizarro, the hardship

2     that you're facing, but it is clearly the case that what would

3     be far worse would be to proceed to trial without counsel

4     adequately prepared and ready and these lines investigated in

5     light of the very substantial penalties that you face for these

6     charged crimes.

7          I will take defense counsel written submission on a

8     renewed bail argument in light of what has occurred.  I will

9     set trial for September 11, 2018.  I recognize the defendants'

10    objections, but I do find that the ends of justice served by

11    granting an exclusion from speedy trial computations for the

12    period from today's date through September 11, 2018 outweigh

13    the interest of the public and the defendants in a speedy trial

14    as this time is necessary for defense counsel to investigate

15    the disclosures and prepare for trial.

16         Let me also say I would consider severance even

17    despite my earlier ruling on severance because I think the

18    government has put itself in a position where that might have

19    been the answer if what we're talking about is the time needed

20    because of schedule and the like, but defense counsel have

21    represented that the time is necessary for their investigation,

22    and certainly in light of what I've seen, the multiple avenues

23    of investigation, legitimate avenues of investigation that have

24    opened in light of the record made to me by defense counsel as

25    to what they intended to do and needed to do, and in light of

I5HQPIZ2

the additional new disclosures containing new information, I do

believe that time is necessary and trial appropriately set for

September 11.

        Mr. Freeman, when would you like to submit a written

submission on your renewed bail argument?

        MR. FREEMAN:  Ten days.

        THE COURT:  Ten days.  And the government will have a

week to oppose.

        Ms. Macedonio.

        MS. MACEDONIO:  Judge, we had conferred earlier this

morning, and we tried to come up with a schedule that made

sense for all counsel.  I am the one, I think, who has a

squeaky wheel because I have another September commitment which

may or may not go.  To the extent that goes, I have a trial in

front of Judge Swain.  This is an earlier commitment, the

Pizarro trial, so if I need some help, I would hope that I

could call your Honor and ask that you reach out to Judge

Swain.

        THE COURT:  Yes.  Thank you.  We'll deal with that.  I

have many matters to move if they go, but we'll proceed as soon

as we can and do that on the 11th.

        Mr. Freeman.

        MR. FREEMAN:  Yes, your Honor.  When I said a

severance, I did mean a severance of defendants so that

Mr. Pizarro could go first in July.  But another option that

I5HQPIZ2

1    came to mind is, you may recall, we moved to sever the 2015

2    robbery from the 2016 attempted robbery and homicide.  And to

3    the extent that you would like to revisit that, we would also

4    be prepared to try the 2015 case earlier.  That wasn't

5    affected, as far as I know, by any of the disclosures, and I

6    think we put forth strong argument at the time, but I know that

7    you denied that motion.  I would just ask you to reconsider.

8             There is one other thing I'd like --

9             THE COURT:  Just to spin it, I don't see a basis to

10   reconsider, but I will think about it.  Of course, if

11   Mr. Pizarro were either convicted or acquitted of that crime,

12   he would still remain detained until the trial on the 2016

13   crime.  So I'm not sure from Mr. Pizarro's perspective how that

14   is helpful.

15            MR. FREEMAN:  Well, because of the reasons we put

16   forth in our motion, we still believe that the 2015 robbery is

17   unduly prejudicial to the trial of the 2016 case, and also it

18   would provide some movement forward in getting the cases tried.

19            However, finally, I would like to say, I would like

20   the record to be clear, I think it is already, but that

21   Mr. Pizarro does not consent to any exclusion of speedy trial

22   from today forward.

23            THE COURT:  I do understand that.  I had presumed that

24   from what you had earlier represented, and I'm regretful we are

25   in the position we are, but I have made my ruling with respect

I5HQPIZ2

1    to the exclusion of time for the reasons indicated over the

2    lack of consent of Mr. Pizarro.

3            Any other matters to take up?

4            MR. SWERGOLD:  Your Honor, there is one matter that

5    the government would just ask:  Docket No. 123 in this case,

6    which has been part of the back-and-forth letter writing, the

7    defendants have done a remarkable job in respecting the secrecy

8    and the sensitive nature of a lot of the information the

9    government has turned over.

10           I just think Docket No. 123 was inadvertently publicly

11   filed, and it contains basically all of the details of the

12   information provided by the person we've referred to as the

13   Danny cooperator, and those notes and that information was

14   provided under the protective order.  So we would just ask that

15   docket be taken off the public record and just be maintained

16   under seal.

17           THE COURT:  Any objection?

18           MR. FREEMAN:  Would the government be kind enough if

19   it has the document to hand it over because there's been such a

20   flurry of filing, I don't want to say something thinking about

21   the wrong document.

22           MS. MACEDONIO:  No objection, your Honor.

23           THE COURT:  Give me the Docket No. again please.

24           MR. SWERGOLD:  123.

25           THE COURT:  123 will be sealed.

I5HQPIZ2

1    That did remind me, I saw no basis for the

2    government's opposition to the defendant's motion to dismiss

3    the indictment to be filed under seal, which I included in my

4    order last night, and the government filed it.  I hoped it was

5    simply because the defense had filed their motion under seal

6    and not because the government was trying to hide its admission

7    of error from the public record.

8    MR. SWERGOLD:  No, of course not, your Honor.  In

9    fact, we were preparing trying to also include a whole factual

10   background, but given the time limits on when we needed to get

11   it done by, and your Honor's familiarity with the record and

12   our understanding we'd probably have argument today, we cut the

13   background out which would have necessitated the sealing and

14   then just didn't make the change.

15   THE COURT:  I accept that representation.  Thank you,

16   Mr. Swergold.

17   But on the defendant's motion, I do think that could

18   be filed in redacted form rather than fully under seal.  So I

19   will ask defense counsel within the next week to file a

20   redacted version on the public docket.

21   Other matters to take up?

22   MR. SWERGOLD:  Nothing more from the government.

23   MR. FREEMAN:  Thank you.

24   MS. STERNHEIM:  Thank you.

25   THE COURT:  Ms. Zornberg, I am grateful for your

I5HQPIZ2

1    presence here as well as the leadership of the office.  I am

2    not a judge who likes -- I've never done that before in a case.

3    I don't like to unnecessarily give a hard time to any lawyers

4    in front of me.  I hope that the steps that are being taken

5    will be fully followed through.

6            Needless to say, when I step back and think about this

7    case, which involves the murder of a witness in a federal case,

8    it was charged with capital eligible charges, I would think

9    that's the case that produces the most dotting of I's and

10   crossing of T's and supervision and level of care possible.

11   And that didn't happen here, and it is troubling.  To the

12   individual lawyers involved, you've come forward now with, I

13   hope, a full statement of the errors that have been made, and

14   that's important.  And even if you discover more down the road,

15   obviously there is only one reasonable option, which is to put

16   that in front of the defense and the Court as soon as possible.

17           And generally I hope what you will learn from this is

18   the need for caution and care.  Your reputation as credible

19   representatives of the government and officers of this court

20   should be first and foremost in your mind, and mistakes like

21   this can lead to damage to that credibility that is not easily

22   repaired.

23           So whatever impact this has on this case, I hope those

24   lessons will be carried with you not only here but going

25   forward.

I5HQPIZ2

1             Ms. Zornberg.

2             MS. ZORNBERG:  You have our full assurance, your

3     Honor, that there has been no waste of time by the leadership

4     of our office, by the AUSAs at counsel table in learning the

5     lessons that need to be learned and taking every proactive

6     measure to prevent recurrence.

7             We take incredibly seriously the fact that we as an

8     office stand on the shoulders of those who came before us, that

9     we are officers of the court, that our credibility with the bar

10    and with the bench is something that is of utmost importance

11    that cannot be squandered.

12            I just want to give you my personal assurance on

13    behalf of myself and the leadership of the office that this is

14    receiving the promptest and most serious attention which it

15    deserves.

16            THE COURT:  I appreciate that, and, of course, just

17    the continued attention, very immediate attention to ensure

18    that these two individuals, these two defendants have a fair

19    trial because all of the required disclosures have been made or

20    will be made immediately.

21            Thank you.  We're adjourned.

22            (Adjourned)

23

24

25